UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RONDA KAY HUTCHINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CV 978 AGF / DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Ronda Kay Hutchinson for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the decision of the Administrative Law Judge should be affirmed.

## I. BACKGROUND

Plaintiff Ronda Kay Hutchinson, born March 20, 1969, applied for Title II benefits on June 16, 2011. (Tr. 117-23.) She alleged an onset date of disability of March 1, 2009, due to fibromyalgia and nerve damage to the neck, back, and hand. (Tr. 149.) Plaintiff's application was denied initially on August 12, 2011, and she requested a hearing before an ALJ. (Tr. 67-76.)

On June 20, 2012, following a hearing, the ALJ found plaintiff not disabled. (Tr. 12-21.) On March 18, 2013, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On March 21, 2009, plaintiff arrived at the emergency room, complaining of an allergic reaction caused by erythromycin and penicillin that resulted in hives and throat constriction. David J. Pernikoff, M.D., diagnosed pruritic disorder, adverse reactions to penicillin and erythromycin, chronic obstructive pulmonary disease, and tobacco abuse.[1] She was discharged on March 24, 2009. (Tr. 207-16.)

On October 9, 2009, plaintiff arrived at the emergency room, complaining of chest pain that began two days earlier. Chest X-rays and CT scans revealed no abnormalities. The impression of John P. Fortney, M.D., was pleurisy and a chest wall muscle strain. (Tr. 305-34.)

On April 28, 2010, plaintiff arrived at the emergency room, complaining of chest pain and left arm pain. Chest X-rays revealed no abnormalities, and a cardiac catheter lab revealed normal coronary arteries. Mehreen Khann, M.D., diagnosed atypical chest pain, hypercholesterolemia, nicotine addiction, obesity, and anxiety. He prescribed Lexapro and ibuprofen, referred her to behavioral health, and recommended that she discontinue smoking.[2] (Tr. 217-39.)

On August 23, 2010, plaintiff complained of back and hand pain and hives that began one year earlier. Thoracic spine X-rays revealed thoracolumbar levoscoliosis, and X-rays of both hands revealed no abnormalities. Rama Bandlamudi, M.D., assessed osteoarthritis due to trauma. (Tr. 291-300.)

On August 27, 2010, plaintiff complained of allergic reactions to insect stings and hives that began in March 2009 after she received an injection of erythromycin. James Temprano, M.D., diagnosed chronic idiopathic urticaria and insect sting anaphylaxis and prescribed ranitidine, Zyflo, Allegra, hydroxyzine, and Zyrtec.[3] (Tr. 256-58, 278-86.)

---

[1] Pruritus is an itch. Stedman's Medical Dictionary 1587 (28th ed., Lippincott Williams & Wilkins 2006) (Stedman).

[2] Lexapro is used to treat depression and anxiety. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

[3] Urticaria is colloquially known as hives. Stedman at 2077. Ranitidine is used to treat and prevent heartburn. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014). Zyflo is used to treat asthma. Id. Allegra and Zyrtec are used to relieve allergy symptoms. Id. Hydroxyzine is used to treat itching caused by allergies. Id.

On December 10, 2010, plaintiff arrived at Mercy Clinic to establish care. Jeffrey C. Faron, M.D., diagnosed hyperlipidemia, generalized anxiety disorder, menopausal symptoms, osteopenia, tobacco use, gastroesophageal reflux disease, urticaria, and chronic back pain. He prescribed Zyflo, Flexeril, Vicodin, Lipitor, Valium, and Premarin.[4] (Tr. 617-29.)

On October 6, 2010, plaintiff reported that she awoke with hives on her neck, low back, and knees during the past three days. She reported that prednisone controlled the hives but that she had tapered prednisone use.[5] She also complained of fatigue caused by pain medication. Dr. Temprano diagnosed chronic urticaria and osteoporosis and discontinued Zyflo. (Tr. 276-77.)

On October 27, 2010, plaintiff arrived at the emergency room, complaining of foot pain due to stubbing her toes. X-rays of the right foot revealed moderately sized calcaneal spurs, no acute fractures, and soft tissue damage. Yolanda A. Acklin, ANP, diagnosed foot sprain and prescribed Naprosyn.[6] (Tr. 240-54.)

On November 5, 2010, plaintiff complained of a cough and congestion. She received a diagnosis of respiratory tract infection and a prescription for Keflex.[7] Plaintiff reported improvement with gastroesophageal reflux disease. Dr. Faron prescribed oxycodone, discontinued Lipitor and hydrocodone, and encouraged plaintiff to discontinue smoking cigarettes.[8] (Tr. 350-55, 630-41.)

On November 12, 2010, plaintiff complained of continued hive outbreaks and mouth ulcers. She reported that she continued to search for employment. Dr. Temprano diagnosed

---

[4] Flexeril is used to treat muscle spasms. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014). Vicodin is used to relieve moderate to severe pain. Id. Valium is used to treat anxiety, pain, muscle spasms, and seizures. Id. Lipitor is used to control cholesterol. Id. Premarin is used to reduce the effects of menopause. Id.

[5] Prednisone is a corticosteroid that reduces allergic-type symptoms. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

[6] Naprosyn is used to treat pain. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

[7] Keflex is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

[8] Oxycodone is used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014). Hydrocodone is used to treat symptoms of the common cold, flu, allergies, or other breathing illness. Id.

chronic idiopathic urticaria, chronic infections, a urinary tract infection, osteopenia, and depression. He prescribed sulfasalazine and Bactrim.[9] (Tr. 272-73.)

On November 22, 2010, plaintiff complained of daily breakouts of hives, and low back pain. She further complained of one hour of joint stiffness and pain each morning and weakness in the limbs. She reported previous employment in waste management. Dr. Bandlamudi and Judy Ko, M.D., opined that the back pain resulted from osteoarthritis caused by trauma. She found no rheumatologic cause for the symptoms. (Tr. 264-67, 270-71.)

On December 8, 2010 plaintiff complained of congestion. Dr. Faron diagnosed respiratory tract infection and prescribed Keflex and Asmanex.[10] (Tr. 356-60, 642-50.)

On December 22, 2010, plaintiff complained of lingering chest congestion and coughing. She requested a refill of Percocet and reported that she began Actonel for osteopenia. She further reported that discontinuing Lipitor did not affect the back pain. Dr. Faron prescribed Lipitor and encouraged plaintiff to stop smoking. (Tr. 361-76, 651-62.)

On January 14, 2011, plaintiff reported daily urticaria, fatigue caused by anti-inflammatory medication, back pain, and heartburn. Dr. Temprano diagnosed chronic idiopathic urticarial, recurrent infections, asthma or chronic obstructive pulmonary disorder, and venom allergy and recommended a skin biopsy. (Tr. 268-69.)

On January 24, 2011, plaintiff reported improved urticarial and chronic obstructive pulmonary disease, and stable generalized anxiety disorder, back pain, and gastroesophageal reflux disease. Dr. Faron diagnosed hyperlipidemia, urticaria, generalized anxiety disorder, chronic back pain, tobacco use, osteopenia, gastroesophageal reflux disease, chronic obstructive pulmonary disease, and vitamin D deficiency and prescribed Advair.[11] (Tr. 377-87, 663-76.)

On February 21, 2011, plaintiff complained of increased back pain and requested an increased dosage of oxycodone. She further complained of irritability, depressed mood, and

---

[9] Sulfasalazine is used to treat arthritis. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014). Bactrim is an antibiotic. Id.

[10] Asmanex is used to control and prevent asthma symptoms. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

[11] Advair is used to control and prevent asthma symptoms. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

-4-

impaired concentration. Dr. Faron diagnosed plaintiff with major depressive disorder and prescribed Cymbalta.[12] (Tr. 388-987, 677-689.)

On March 21, 2011, plaintiff complained of mild muscle spasms in the neck and sore throat. Chest X-rays revealed new atelectasis or infiltrate and possible bilateral pulmonary nodules, and a chest MRI scan revealed no acute abnormalities. Dr. Faron diagnosed neck pain and prescribed analgesics and clindamycin.[13] He referred her to a pain clinic for the back pain. (Tr. 398-409, 690-702.)

On April 11, 2011, plaintiff arrived at the emergency room, complaining of neck pain and swelling that began two weeks earlier and caused the head to tilt. She reported that a neck injection did not improve the pain. She also noted tingling in her fingers, drowsiness, confusion, and somnolence. An MRI scan of the brain was unremarkable, and an MRI scan on the neck revealed soft tissue swelling and edema of the paraspinal muscles. An electromyogram revealed significant left ulnar neuropathy and an entrapment site across the elbow. Kamalini Nadarajah, M.D., diagnosed fibromyalgia, chronic obstructive pulmonary disease, diabetes, left ulnar neuropathy caused by an elbow entrapment, and edema and referred her to orthopedics. She was discharged on April 15, 2011. (Tr. 414-42, 538-40.)

On April 25, 2011, plaintiff complained of the inability to hold her head up, neck pain, and left arm numbness that radiated to the hand. She requested pain medication. Daniel J. Martin, Jr., M.D., diagnosed neck pain and neuropathy. (Tr. 443-56, 703-15.)

On May 7, 2011, plaintiff arrived at the emergency room, reported that her spouse disposed of her pain medication, and requested a refill. (Tr. 457-67.)

On May 9, 2011, plaintiff arrived at the emergency room, complaining of left arm pain and numbness and requesting a pain medication refill. She reported attending physical therapy for the arm and that she could not open or close the hand due to pain. An MRI scan of the cervical spine revealed mild spondylosis. Plaintiff complained of pain during direct examination of the left arm but did not react when medical personnel interacted otherwise with the left arm. She used one hundred pain pills in ten days. (Tr. 468-80.)

---

[12] Cymbalta is used to treat depression and anxiety. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

[13] Clindamycin is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

On the same date, plaintiff complained of neck and back spasms and pain. P. Yoon, M.D., diagnosed neck pain and fibromyalgia. (Tr. 525-28.)

On the same date, plaintiff reported that she met with a pain clinic physician earlier that day who did not satisfy her. She also inquired about fibromyalgia. Dr. Faron referred her to another rheumatologist and encouraged her to stop smoking cigarettes. (Tr. 716-28.)

On May 10, 2011, plaintiff complained of neck pain that began a few months earlier. She reported intermittent neck pain since a motor vehicle accident in 1995. She reported that treatment had improved the low back pain. Nabil Ahmad, M.D., observed left arm and grip weakness, left arm numbness, poor cervical posture, and the neck tilting to the left. His impression was fibromyalgia, neck pain, and left ulnar neuropathy. The impression of Nabil Ahmad, M.D., was myofascial, cervical, and scapular pain, fibromyalgia, and polyneuropathy. He recommended conservative treatment, including physical therapy, a home exercise program, diclofenac, and baclofen.[14] (Tr. 529-32.)

On June 5, 2011, plaintiff reported receiving care at the pain clinic but described the medications as ineffective. She requested a refill of pain medication and reported that Cymbalta improved the depression and anxiety. Dr. Faron discontinued Valium. (Tr. 481-91.)

On June 9, 2011, plaintiff complained of neck and shoulder pain and left arm pain and sensitivity. Dr. Ahmed observed slight rotation of plaintiff's neck and muscle tightness. His impression was left ulnar neuropathy with complex regional pain syndrome. He ordered a triple phase bone scan and prescribed gabapentin and Zoster.[15] (Tr. 533-35.)

On June 15, 2011, a triple phase bone scan revealed normal blood flow, blood pooling, bone distribution but no asymmetric activity. (Tr. 541-42.)

On June 30, 2011, plaintiff arrived at the emergency room, complaining of tongue swelling. She reported chronic recurrent streptococcal pharyngitis. Medical personnel observed a white coating and irritation of the tongue and white flecks in the mouth. X-rays of the chest and neck revealed no abnormalities. She received diagnoses of thrush and bronchitis and a prescription for Nystatin. (Tr. 501-10.)

---

[14] Diclofenac is used to relieve arthritis symptoms. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014). Baclofen is used to treat muscle spasms. Id.

[15] Gabapentin is used to relieve nerve pain following shingles. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014). Zoster is a vaccine used to prevent shingles. Id.

On July 13, 2011, Dr. Yoon performed an ulnar nerve decompression on plaintiff. She tolerated the procedure well and left in stable condition. (Tr. 543-46.)

On July 27, 2011, plaintiff complained of increased pain in her lower arm, constant numbness, occasional shooting pain to her shoulder, and leg spasms at night. Dr. Yoon noted a well-healed incision with moderate hematoma and observed a decreased ulnar nerve sensation. He recommended an elbow brace. (Tr. 537, 547.)

On July 31, 2011, plaintiff arrived at the emergency room, complaining of a sore throat and upset stomach. However, she left without medical attention. (Tr. 556-62.)

On August 10, 2011, plaintiff reported confusion due to the advice of multiple physicians. Dr. Faron diagnosed major depressive disorder, fibromyalgia, osteopenia, tobacco use, and chronic back pain. (Tr. 765-73.)

On August 12, 2011, Ron Selinger submitted a Physical Residual Functional Capacity Assessment form regarding plaintiff. He found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and walk for six hours in an eight-hour workday, and sit for six hours. He found limitations with the ability to reach, handle, and finger, and that she should avoid concentrated exposure to extreme heat, wetness, humidity, noise, and hazards and avoid moderate exposure to extreme cold and vibration. He found plaintiff's allegations credible. (Tr. 548-54.)

On August 29, 2011, plaintiff arrived at the emergency room, complaining of neck and back pain and fibromyalgia. She reported use of Percocet for several years but stated her intent to use narcotics no longer. She further reported that attempts to discontinue Percocet had resulted in nausea, pain, and headaches. X-rays of the chest revealed no abnormalities. The impression of Christopher P. Cundiff, M.D., was opiate withdrawal, opiate dependence, and myalgia, and he encouraged her to coordinate her attempts to discontinue narcotics with her pain management specialist. (Tr. 563-93.)

On September 9, 2011, plaintiff complained of numbness in both legs and in the pinky but reported reduced elbow pain. Dr. Yoon opined that plaintiff experienced peripheral neuropathy and recommended a neurologist. (Tr. 911, 933.)

On September 14, 2011, plaintiff reported continued back pain. Dr. Faron described the major depressive disorder as improved and the chronic obstructive pulmonary disorder as stable. (Tr. 774-86.)

On October 6, 2011, plaintiff complained of neck pain, low back pain, and left arm weakness and that lifting heavy objects and repetitive use of the hand exacerbate the symptoms. Dr. Ahmad diagnosed myofascial pain, cervicalgia, ulnar neuropathy, sacroiliac joint dysfunction, low back pain, and diabetic neuropathy. He recommended a nerve conduction study, electromyogram, and a home exercise program, discontinued diclofenac, and increased the dosage of gabapentin. (Tr. 912-16.)

On October 7, 2011, a nerve conduction study revealed chronic denervation changes at the L5-S1 muscles but no evidence of tarsal tunnel syndrome.[16] (Tr. 928-31.)

On October 19, 2011, plaintiff complained of restless legs and insomnia, reported reduced Percocet use, and requested Ambien.[17] She further reported improved back pain and depression. Dr. Faron prescribed Ambien. (Tr. 788-801.)

On October 27, 2011, plaintiff complained of urticaria. She noted that she could not afford Allegra and that she did not want to see an allergist. Dr. Faron recommended Xyzal, Zyrtec, and Claritin.[18] (Tr. 802-810.)

On November 14, 2011, plaintiff reported improved back pain and depression. She further reported that she discontinued Percocet. Dr. Faron diagnosed chronic back pain, insomnia, and major depressive disorder. (Tr. 811-24.)

On December 9, 2011, plaintiff reported that Advair improved the chronic obstructive pulmonary disease and that Ambien no longer effectively treated the insomnia. Dr. Faron prescribed alprazolam.[19] (Tr. 825-38.)

---

[16] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1–C7), twelve thoracic vertebrae (denoted T1–T12), five lumbar vertebrae (denoted L1–L5), five sacral vertebrae (denoted S1–S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman at 226, 831, 1376, 1549, 1710, Plate 2.

[17] Ambien is used to treat insomnia. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

[18] Xyzal, Zyrtec, and Claritin are used to relieve allergy symptoms. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

[19] Alprazolam is used to treat anxiety and panic disorders. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

On January 17, 2012, plaintiff complained of neck, back, left arm, and left leg pain and reported that she took Aleve for pain. Dr. Ahmad assessed myofascial pain, cervicalgia, ulnar neuropathy, lumbar spondylosis, lumbar radiculitis, sacroiliac joint dysfunction, low back pain, and diabetic neuropathy. He prescribed Neurontin and recommended an MRI scan of the lumbar spine.[20] (Tr. 917-21.)

On January 23, 2012, plaintiff complained of persistent insomnia, refused referrals to sleep specialists or psychiatrists, and requested another medication. Dr. Faron diagnosed insomnia and prescribed Remeron and Restoril.[21] (Tr. 839-47.)

On January 30, 2012, plaintiff complained of back pain and sinuses. She further complained of a cough and chest congestion that began after she mulched leaves three days earlier. Plaintiff declined to go to the emergency room. Dr. Faron prescribed Vibramycin, prednisone, and Percocet.[22] (Tr. 848-58.)

On January 31, 2012, an MRI scan of the lumbar spine revealed right foraminal and lateral disc bulge at L3-L4. (Tr. 927.)

On February 8, 2012, plaintiff arrived at the emergency room, complaining of difficulty breathing. A chest X-ray revealed no abnormalities. Stephen A. Hilton, M.D., observed improvement after nebulizer treatment. He diagnosed acute bronchitis and chronic obstructive pulmonary disorder and prescribed albuterol.[23] (Tr. 597-615.)

On February 17, 2012, plaintiff complained of intermittent hoarseness and reported that she could not take Advair due to the cost. She further reported recurring symptoms each time she discontinued prednisone. Dr. Faron provided Advair samples and prescribed albuterol and prednisone. (Tr. 859-71.)

---

[20] Neurontin is also known as gabapentin. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

[21] Remeron is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014). Restoril is used to treat insomnia. Id.

[22] Vibramycin is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014). Percocet relieves moderate to severe pain. Id.

[23] Albuterol is used to treat asthma. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014).

On February 29, 2012, plaintiff complained of upper respiratory symptoms. Dr. Faron diagnosed chronic obstructive pulmonary disease, chronic back pain, oral thrush, and major depressive disorder. He prescribed Diflucan and doxycycline.[24] (Tr. 872-85.)

On March 8, 2012, plaintiff complained of a painful, blistering abdominal rash and upper respiratory symptoms, including wheezing, that worsened after she discontinued prednisone. Dr. Faron diagnosed acute bronchitis, chronic obstructive pulmonary disease, and shingles. He prescribed Septra and acyclovir and recommended chest X-rays.[25] (Tr. 886-99.)

On March 22, 2012, plaintiff complained of nasal congestion and shingles. Dr. Faron diagnosed chronic back pain, fibromyalgia, acute bronchitis, and shingles. (Tr. 900-909.)

On March 23, 2012, plaintiff complained of neck, back, left arm, and left leg pain. Dr. Ahmad assessed myofascial pain, cervicalgia, ulnar neuropathy, lumbar spondylosis, lumbar radiculitis, sacroiliac joint dysfunction, low back pain, and diabetic neuropathy. He prescribed baclofen and Neurontin. (Tr. 922-26.)

On May 6, 2012, Dr. Ahmad submitted a Medical Source Statement regarding plaintiff. Plaintiff's diagnoses included myofascial pain, cervicalgia, ulnar neuropathy, lumbar spondylosis, lumbar radiculitis, sacroiliac joint dysfunction, low back pain, and diabetic neuropathy. He found that she could lift five pounds or less frequently, six to ten pounds occasionally, stand and sit for one hour total during an eight-hour workday and continuously for only thirty minutes, and could not push or pull. He further found that plaintiff required rest in the reclining position during the day. Additionally, he found that she could only occasionally bend, reach, handle, or finder, and never kneel. He also found that she could only occasionally work with heights, machinery, extreme temperatures, fumes, and vibrations. (Tr. 935-36.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on May 15, 2012. (Tr. 27-64.) Plaintiff testified the following. She is age forty-three and lives in a house with her spouse. He works from 5:30 a.m. to 3:00 p.m. She graduated from high school and measures five feet, three inches and 137

---

[24] Diflucan is an antifungal. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014). Doxycycline is an antibiotic. Id.

[25] Septra is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on August 22, 2014). Acyclovir is an antiviral. Id.

pounds. She has a Facebook account and email address, but she rarely uses them. She filed a worker compensation claim for a broken back and neck, which she later settled. She has health insurance through her spouse's employment. She received unemployment benefits during the alleged period of disability but believed she could work when she applied for the unemployment benefits. (Tr. 30-34.)

She left Waste Management because she could no longer perform her duties as an office assistant, and she had poor work attendance due to hives. Her duties included data entry, routing drivers, and inventory. She also worked at a collections call center for Aetna Life Insurance and for Macy's. She delivered automobile parts. She drove a school bus for nearly a year. She worked in a factory where she put electrical wiring into refrigerators and suffered the back and neck injury. She separated trash from recyclables for the city of St. Peters at the recycling center for only a few months due to hives. She also delivered coffee and cream in 1999. (Tr. 34-39.)

She first experienced hives in 1996. They appear intermittently and in patches. Hives also cause swelling near the eyes. She received an initial diagnosis for hives in 2009. Fibromyalgia causes hives. She takes prednisone to relieve them. Prednisone caused weight gain of twenty-five to thirty pounds. (Tr. 40-42.)

Fibromyalgia also prevents her from working, and she received the initial diagnosis in 2010. She takes Cymbalta for the fibromyalgia. She also has neuropathy at the elbow, which required surgery. She has numbness in three fingers and forearm and pain in the left foot and right thigh. She takes gabapentin for neuropathy. She also takes oxycodone, Naproxen, and baclofen. Dr. Ahmad and Dr. Faron prescribe her medication. (Tr. 42-45.)

She did not retire from Waste Management. She is back on oxycodone, although she tries to avoid it because it affects her functioning. Prednisone caused shingles. She has seen Dr. Faron, a primary care physician, since 2010. She has seen Dr. Ahmad for neuropathy and back pain since June 2011. He referred her to a neurologist. She sees Dr. Ahmad and Dr. Faron monthly. (Tr. 45-47.)

She smokes three cigarettes per day but had smoked at a rate of a one pack per day. Her doctors advised her to stop smoking. She stopped drinking alcohol at age thirty. She drives occasionally. She does not wash dishes, launder, vacuum, or perform yard work. She empties the trash, cooks occasionally, shops for groceries with her husband, arranges her bed, cleans the sink and counters, and dusts. She attends church. She can no longer play guitar due to finger

numbness or ride her motorcycle. She prunes plants. She has not fished in five years. She tried but could not ride a bicycle one year ago. She stopped golfing in 2009. (Tr. 47-51.)

She can walk twenty to thirty minutes before she needs to sit for a few minutes. She can stand for ten to fifteen minutes. She can sit for a half hour before she experiences back pain, which she alleviates by shifting positions. She can lift a gallon of milk. Her doctors have placed no physical restriction on her. (Tr. 51-52.)

She broke her neck and back in 1997. Her medications cause fatigue and grogginess. She has chronic obstructive pulmonary disorder and uses an inhaler daily. Walking across her small house causes labored breathing. She would miss three days during a five-day workweek due to insomnia, pain caused by neuropathy and fibromyalgia, and grogginess caused by her medications. Her spouse writes for her because she is left-handed and the neuropathy affects her left hand. Her sister filled out the application for disability benefits because she could not. She stopped working April 2009 due to unreliable attendance. She could not perform the Waste Management job due to the long hours and her inability to write. She could not perform collections work due to unreliable attendance and pain. Heat, cold, and fumes affect her. (Tr. 52-57.)

Vocational Expert (VE) James Israel also testified at the hearing. Plaintiff worked as an office clerk, which is light, semiskilled work; collection clerk, which is sedentary, semiskilled work; survey compiler, which sedentary, semiskilled work; production laborer, which is heavy, unskilled work; delivery route driver, which is medium, semiskilled work; and bus driver, which, as performed by plaintiff, was light, semiskilled work. The clerical and driving skills could transfer to other jobs. (Tr. 57-60.)

The ALJ presented a hypothetical individual with plaintiff's education and work experience, who could perform light work but could climb stairs and ramps only occasionally, never climb ropes, ladders, or scaffolds, only occasionally stoop, kneel, crouch, and crawl, and only frequently reach, finger, or handle. The ALJ further indicated that the individual should avoid concentrated exposure to extreme temperatures, fumes, odors, dust, and gas. The VE responded that such individual could perform as a collection clerk, survey compiler, and general office clerk and that each type of work had thousands of positions in Missouri. (Tr. 61.)

The ALJ altered the hypothetical individual by limiting the individual to sedentary work. The VE responded that such individual could perform as a collection clerk, which is work with

1,150 positions in Missouri, and survey compiler, which is work with 150 positions in Missouri, but could not perform as a general office clerk as performed by plaintiff because it required standing for more than twenty-five percent of the day. The ALJ altered the hypothetical individual by limiting the individual to only occasional handling and fingering. The VE responded that such individual could perform no work. (Tr. 62-63.)

### III. DECISION OF THE ALJ

On June 20, 2012, the ALJ issued a decision that plaintiff was not disabled. (Tr. 12-21.) At Step One of the prescribed regulatory decision-making scheme,[26] the ALJ found that plaintiff had not engaged in substantial gainful activity since March 1, 2000, the alleged onset date. At Step Two, the ALJ found that plaintiff's severe impairments included fibromyalgia, left ulnar radiculopathy, chronic obstructive pulmonary disease, and low back pain. (Tr. 14.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 15.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform sedentary work, except that she can only occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl, and can never climb ropes, ladders, or scaffolds. He further limited her to frequent reaching, handling, and fingering and found that she should avoid concentrated exposure to extreme temperatures, fumes, odors, dust, and gases. At Step Four, the ALJ found that plaintiff could perform past relevant work as a collection clerk. (Tr. 15-20.)

Alternatively, at Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 20.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In

---

[26] See below for explanation.

determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by: (1) finding plaintiff not credible; (2) improperly evaluating the opinion of her treating physician, Dr. Ahmad; and (3) improperly determining plaintiff's RFC.

### A. Credibility

Plaintiff argues that the ALJ improperly determined that her allegations of disabling impairments were not credible. To evaluate a claimant's subjective complaints, the ALJ must

consider the Polaski factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010). The ALJ may also consider inconsistencies in the record as a whole. Id. "[Courts] defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Id.

The ALJ may validly consider the use of over-the-counter pain medication when stronger medication is available. Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999). The conservative nature of a claimant's treatment is also a valid consideration. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). "Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997). A claimant's work history with the allegedly disabling medical conditions is yet another valid consideration. Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008).

The ALJ found plaintiff's allegations not fully credible. (Tr. 19.) He noted that although she alleged that her medications caused drowsiness, the record indicates no such complaints to her treating physicians. (Id.) Although plaintiff complained that her medications caused drowsiness, she did not do so within the year the preceded the ALJ hearing. (Tr. 276-77, 414.)

The ALJ further noted plaintiff's work history prior to March 2009, the alleged onset date, and that her condition did not deteriorate significantly prior to that date. (Tr. 17-18.) The treatment notes near March 2009, the alleged onset date, refer only to an emergency room visit when an allergic reaction to medication caused hives. (Tr. 207-16.) The ALJ did not find plaintiff's allergies to be severe impairments. (Tr. 14.) Moreover, plaintiff testified that she had had hives since 1996 but reported that she had worked sixty hours per week at Waste Management. (Tr. 40, 133, 159.) The record indicates that, following the March 2009 emergency room visit, plaintiff did not mention hives to medical personnel until August 2010. (Tr. 291-300.)

Additionally, the ALJ noted inconsistent reports from plaintiff in the treatment notes and the function report. (Tr. 17-18.) On April 28, 2010, plaintiff reported that she had retired from Waste Management. (Tr. 220.) Additionally, she reported that only her spouse shops for groceries, she can only dust and make the bed, and that she never drives. (Tr. 170-77.) However, at the hearing, she testified that she left due to hives and poor work attendance, that

she assists with grocery shopping, cleans sinks and counters, empties the trash, cooks, and prunes plants. (Tr. 47-51.) She also testified that she could drive and that she did so occasionally. (Id.)

The ALJ also noted plaintiff's ability to discontinue strong pain medication and that she failed to comply with medical instructions. (Tr. 17-18.) On November 11, 2011, plaintiff reported that she discontinued Percocet. (Tr. 811-24.) On January 17, 2012, plaintiff reported that she took only Aleve for pain. (Tr. 917-21.) Furthermore, on April 28, 2010, Dr. Khann recommended that she discontinue smoking, which Dr. Faron reiterated on multiple occasions. (Tr. 218, 375, 724.) However, plaintiff testified that she continued to smoke at the ALJ hearing in May 2012. (Tr. 47.)

The ALJ added that plaintiff received only conservative treatment for fibromyalgia, neuropathy, anxiety, and depression. (Tr. 17-19.) Regarding the fibromyalgia, Dr. Ahmad recommended conservative treatment, including physical therapy, a home exercise program, and medication. (Tr. 529-32.) Regarding ulnar neuropathy, plaintiff underwent nerve decompression in June 2011. (Tr. 543-46.) Two weeks later, Dr. Yoon recommended an elbow brace. (Tr. 547.) Further nerve conduction studies revealed no abnormalities regarding the elbow condition. (Tr. 928-31.) Additionally, plaintiff reported that Cymbalta significantly improved her anxiety and depression, and she rejected further psychiatric treatment. (Tr. 490, 843.)

Therefore, substantial evidence supports the ALJ determination of credibility. Accordingly, plaintiff's argument regarding credibility is without merit.

**B. Opinion of Dr. Ahmad**

Plaintiff argues that the ALJ improperly discounted the opinion of her treating physician, Dr. Ahmad. The ALJ should consider each of the following factors in evaluating medical opinions: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is also a specialist; and (6) any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c). Further, an ALJ is not obligated to defer to a treating physician's medical opinion unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the

other substantial evidence in the record." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008) (quoting Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005)).

On May 6, 2012, Dr. Ahmad submitted a medical opinion regarding plaintiff. (Tr. 935-36.) He found that she could lift five pounds or less frequently, six to ten pounds occasionally, stand and sit for one hour total during an eight-hour workday and continuously for only thirty minutes, and could not push or pull. (Id.) He further found that plaintiff required rest in the reclining position during the day. (Id.) Additionally, he found that she could only occasionally bend, reach, handle, or finder, and never kneel. (Id.) He also found that she could only occasionally work with heights, machinery, extreme temperatures, fumes, and vibrations. (Id.)

The ALJ discussed Dr. Ahmad's opinion but afforded the opinion little weight. (Tr. 18.) The ALJ found such limitations inconsistent with the record and Dr. Ahmad's treatment notes, which indicated that plaintiff had the full range of motion for her back and neck, took only over-the-counter pain medications, and recommended conservative treatment. (Id.)

Dr. Ahmad observed a full range of motion for the neck and spine on multiple occasions. (Tr. 914-15, 919-20, 924-25.) He also documented plaintiff's use of Aleve for pain after she discontinued Percocet. (Tr. 811-24, 917-21.) Upon his initial assessment of plaintiff in May 2011, he recommended a conservative course of treatment. (Tr. 529-32.) Two months later, he performed nerve decompression on plaintiff's left elbow. (Tr. 543-46.) Thereafter, Dr. Ahmad's treatment consisted solely of prescriptions and diagnostic testing, including MRI scans and nerve conduction studies. (Tr. 912-26.)

Therefore, substantial evidence supports the ALJ's determination that Dr. Ahmad's opinion was inconsistent with the record. Accordingly, plaintiff's argument regarding Dr. Ahmad's opinion is without merit.

**C. RFC Determination**

Plaintiff argues that substantial evidence does not support the RFC determination of the ALJ. Residual functional capacity is the ability of a claimant "to do the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998). Residual functional capacity is a medical determination. Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.

2000). Some medical evidence must support the RFC determination. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ determined that plaintiff had the RFC to perform sedentary work, except that she can only occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl, and can never climb ropes, ladders, or scaffolds. (Tr. 15-20.) He further limited her to frequent reaching, handling, and fingering and found that she should avoid concentrated exposure to extreme temperatures, fumes, odors, dust, and gases. (Id.)

The RFC determination acknowledges significant limitations regarding plaintiff's ability to work. See 20 C.F.R. § 404.1567(a) (defining sedentary work). To the extent that plaintiff disagrees with the ALJ's determination, the evidence set forth above that supports the ALJ's decision regarding plaintiff's credibility and the opinion of Dr. Ahmad also supports the RFC determination.

Because substantial evidence supports the RFC determination, plaintiff's argument regarding the RFC is without merit.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/s/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 27, 2014.